## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

————————————————————————————

|  |  |  |
|---|---|---|
| **MICHAEL MCGRATH, et al.,** | ) | |
| | ) | |
| | ) | **Civil Action No.** |
| **Plaintiffs,** | ) | **17-10979-FDS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF SOMERVILLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

————————————————————————————

## MEMORANDUM AND ORDER ON
## MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, §§ 148, 150.  Plaintiff Michael McGrath and 82 other individually named plaintiffs are current and former police officers who are or were employed by defendant the City of Somerville, Massachusetts, between May 26, 2014, and May 26, 2017.  The complaint alleges that the officers regularly worked more than 40 hours a week but were not paid overtime as required by law.

This is not a typical claim for unpaid wages.  Somerville police officers are paid generously, according to a complicated system with various supplements and bonuses depending on their rank, seniority, duties, shift, education, and training.  They also have ample opportunities for paid details, including an entitlement to certain minimum payments even if little work was performed.  Those provisions are the product of a collective bargaining agreement between the police officers' union and the City, negotiated with the participation of experienced labor counsel

on both sides.

Plaintiffs do not allege that the City breached the terms of the CBA.  Instead, they argue

that by *complying* with the CBA, the City violated both the FLSA and the Massachusetts Wage

Act, and that they are entitled to additional overtime pay as a matter of law.  Their claims are

highly technical, and involve the intersection of a complex compensation scheme and complex

provisions of federal labor law.

The parties have filed cross-motions for summary judgment as to a variety of issues.  For

the following reasons, both motions will be denied in part and granted in part.

## I.      Background

Except where otherwise noted, the following facts are set forth in the record and are

undisputed.

### A.      Factual Background

Michael McGrath and 82 other individual plaintiffs are current or former police officers

employed by defendant the City of Somerville between May 26, 2014, and May 26, 2017.  (First

McGrath Aff. ¶ 1).  The Somerville Police Employees Association ("the SPEA") is the exclusive

bargaining agent for all Somerville Police Patrol Officers, including plaintiffs.  (Def.'s SMF ¶ 3).

#### 1.      The Collective Bargaining Agreement

On November 8, 2007, the City and the union executed a collective bargaining agreement

(the "CBA").  (Def.'s Ex. 2 (CBA) at 57).  The City and the union modified the CBA in March

2009 and again in November 2011.  (*Id.* at 59-63).  The City was represented by experienced

labor and employment counsel throughout the negotiations and modifications of the CBA.

(Collins Decl. ¶ 3).  The union was also represented in the negotiations by counsel.  (*Id.*).  Over

the course of the negotiations, neither the City's outside counsel nor the union's counsel

suggested that the provisions of the CBA failed to comply with the FLSA.  (*Id.* ¶ 4).  The City's

then Chief Labor Counsel, Robert Collins, believed that the CBA complied with the law.  (*Id.*).

The CBA expired on June 30, 2012.  (CBA at 61; Buckley Decl. Ex. 3 at 64).  It is

unclear what happened next, but in 2014, a petition was filed for exercise of jurisdiction before

the Joint Labor Management Committee ("JLMC") to reach a successor contract through a form

of interest arbitration.  (Buckley Decl. Ex. 3 at 64).[1]  On December 22, 2016, the JLMC issued

its decision, modifying certain terms of the CBA and implementing an "evergreen clause," which

extended the CBA until the City and the union reach a new agreement.  (*Id.* at 76-77, 114).  In

January 2019, the City and the union commenced bargaining over the terms of a new CBA.

(Cooper Decl. ¶ 9).  At the time of the filing of motions for summary judgment, those

negotiations were still ongoing.  (*Id.*).

From May 2014 to the present, the City has paid plaintiffs as specified by the CBA.

(First McGrath Aff. ¶ 6).

### a.    Assignments, Schedules, and Shifts

The CBA governs the assignments, schedules, and shifts of police officers.  (CBA Art.

VIII §§ 1-3).  Non-superior officers may be assigned to the following divisions:  (1) patrol; (2)

station; (3) neighborhood police; (4) traffic bureau; (5) criminal investigation/detective bureau;

and (6) administrative duties/other.  (Buckley Decl. Ex. 4).  Officers assigned to the patrol,

station, and neighborhood police divisions work a "four-and-two" schedule, working four days

followed by two days off.  (CBA Art. VIII § 2(a)).  Officers assigned to the traffic, criminal

investigation/detective, or administrative divisions generally work a "five-and-two" schedule,

working five consecutive days Monday through Friday with Saturday and Sunday off.  (CBA

---

[1] The City contends that the union filed the petition.  Plaintiff admits that a petition was filed with the
JLMC but contends that there is no evidence cited as to who filed the petition.  (Def. SMF ¶ 12 & Pl. Resp.).

Art. VIII § 2(b)).  Officers work one of three eight-hour shifts:  (1) day shift (8:00 a.m. to 4:00 p.m.); (2) first half shift (4:00 p.m. to midnight); or (3) last half shift (midnight to 8:00 a.m.).  (CBA Art. VIII § 1(a)).

Officers assigned to the patrol and neighborhood divisions attend "[r]oll call immediately prior to the commencement of each work shift or tour of duty, not to exceed fifteen (15) minutes," which is explicitly excluded from the CBA's definition of "overtime service."  (CBA Art. VIII § 3(a)(4)).  The CBA also refers to that roll call time as "unpaid" and excludes it from its definition of officers' "regular work day."  (CBA Art. VIII § 1).  At roll call, officers receive information about prior and upcoming shifts and pick their assignments.  (Clark Dep. at 21; McDaid Dep. at 61).  Officers receive no additional compensation for their time spent attending roll call.  (CBA Art. VIII § 1).

**b.     <u>Compensation</u>**

An officer's annual base salary is determined by seniority within the department.  (CBA Art. XIX § 1).  Each Friday, officers receive 1/52 of their annual base salary, regardless of their actual hours worked in their regularly scheduled shifts.  That pay is intended to compensate them for all hours associated with their regularly scheduled shifts during the preceding seven-day period.  (Monaco Dep. at 12; Nardone Dep. at 25; Shea Dep. at 49).  Officers are compensated based on a seven-day workweek, running from Sunday through Saturday.  (Elpidoforos Dep. at 52; McDaid Dep. at 53; McGrath Dep. at 31; Nardone Dep. at 31; Shea Dep. at 50).  Officers receive an additional seven percent of their weekly base salary each week "in recognition of their availability to work nights" ("night-availability differential").  (CBA Art. XIX § 2(a)).  In addition to the night-availability differential, each officer who works a first-half or last-half shift receives a night differential of $1,000 per year.  (CBA Art. XIX § 2(b)).  Officers who work a

4

weekend shift receive an additional $7.00 or $6.50 per hour.  (CBA Art. XIX § 4(a)-(b)).

Officers who have a degree in law enforcement receive an additional 5% to 12.5% of their weekly base salary, depending on the level of law-enforcement-specific education attained. (CBA Art. XIX § 5(b)).  Officers who have an advanced degree in a field other than law enforcement receive an annual bonus between $300 and $500.  (CBA Art. XIX § 5(a)).  Eligible officers receive an annual weapons-of-mass-destruction stipend of $500.  (CBA Art. XIX § 7). Officers receive an annual bonus between $475 and $600 depending on their performance in a weapons-performance examination.  (CBA Art. XIX § 6).  Officers who have worked for the department for more than five years receive an annual bonus between $200 and $3,900.  (CBA Art. XIX § 3).  Officers who have worked for the department for more than twenty years receive an additional annual bonus between $800 and $3,200.  (CBA Art. XIX § 3(A)).

Officers are compensated for fourteen annual holidays, including their birthdays.  (CBA Art. IX § 1).  On holidays, officers receive an additional day's pay, computed at one-fourth of their weekly compensation.  (CBA Art. IX § 3).

### c.      Overtime Compensation

All service outside of an officer's regularly scheduled tour of duty or work shift (other than paid police details) is considered overtime service.  (CBA Art. VIII § 3; Shea Dep. at 46). Officers performing overtime service receive one-and-a-half times their hourly rate of pay for each hour of overtime service or fraction thereof.  (CBA Art. VIII § 5; D'Angeli Dep. at 32-33). The straight-time hourly rate is calculated by dividing the sum of each officer's weekly base salary, educational-incentive payment, and night-availability differential by 40.  (*Id.*).  Overtime service following an officer's regular tour of duty is not compensated unless such overtime service continues beyond the first quarter hour.  (CBA Art. VIII § 5).  Beyond the first quarter

hour, the straight-time hourly rate is computed to the next hour.  (CBA Art. VIII § 5).

If an officer misses a regular shift due to vacation, sick time, or personal time, he or she still receives overtime compensation for work performed outside of regular shifts.  (Elpidoforos Dep. at 111; McCarey Dep. at 147-48; Monaco Dep. at 139).

Officers are paid a minimum of four hours of overtime compensation if they are recalled to police headquarters or any other place or are placed on a standby basis after their regular work shift.  (CBA Art. VIII § 3(b)).  Officers are paid a minimum of four hours of overtime compensation for time spent attending court outside of regularly scheduled shifts.  (CBA Art. V § 1).

Overtime compensation is paid on a weekly basis.  (CBA Art. VIII § 5(b)).  It is not necessarily paid in the Friday paycheck immediately following the end of the seven-day workweek.  (First McGrath Aff. ¶ 7; D'Angeli Dep. at 72-74).[2]

### d.    Paid Details

Officers are afforded the opportunity to volunteer to work paid details.  Details are work assignments in which an entity other than the department pays for an officer to provide services such as traffic control for a construction project or security at an event.  (CBA Art. VI; E. Roche Dep. at 43-44, 81; Elpidoforos Dep. at 84-86).  From May 2014 through January 2017, the detail rate was $43 per hour.  (E. Roche Decl. ¶ 12; Third McGrath Aff. ¶ 20).  In January 2017, it was increased to $46 per hour.  (*Id.*).  In January 2019, it was increased to $60 per hour.  (*Id.*).[3]

Officers are guaranteed a minimum of four hours of pay per detail.  (CBA Art. VI § 8).  For road or construction details exceeding four hours, officers are guaranteed a minimum of

---

[2] The City disputes this statement to the extent that it suggests that the City has not timely compensated plaintiffs for overtime.  (Pl. SMF ¶ 7 & Def. Resp.).

[3] The CBA provides that all details shall be paid at a minimum rate of $40 per hour.  (CBA Art. VI § 8).

eight hours of pay.  (*Id.*).  Hours worked in excess of eight hours on a detail are compensated at a rate of one-and-a-half times the applicable detail rate.  (*Id.*).  The applicable detail rate is increased by one dollar hourly for details performed from midnight to 8:00 a.m., on Sundays, and on select holidays.  (E. Roche Decl. ¶ 13).[4]

The City maintains a special detail fund into which all money received from police details is deposited and from which detail money is paid to employees.  (CBA Art. VI § 11).  The City is required to pay officers for details within 21 calendar days after a detail has been worked and the proper documentation has been submitted.  (*Id.*).[5]

Details may be requested by private contractors performing work in the City; City departments, such as the Department of Public Works; or state agencies with projects in the City, such as the Massachusetts Department of Transportation.  (E. Roche Dep. at 15-24, 62-70, 97-98).[6]  The mechanism by which private contractors pay the City for detail work has varied over time and based on the type of project.  (*Id.* at 73-77).  City details are occasionally paid for by check from a third party.  (E. Roche Decl. ¶¶ 8-9).[7]  For some private parties with whom the City contracts to perform work on behalf of the City, the department detail clerks make entries to show that the detail is a City detail.  (First McGrath Aff. ¶ 29; E. Roche Dep. at 120-21).[8]

---

[4] Details performed on certain other holidays are paid at one-and-a-half times the regular detail rate.  (CBA Art. VI § 8).

[5] It typically takes two or more weeks after the City is invoiced for a City detail to issue a notice to fund payment.  (E. Roche Dep. at 84).  Upon receiving notice of a journal entry showing a transfer of funds to pay for police details, the police department detail clerk immediately notifies the City's payroll department, which in turn causes payment to the police officer in the upcoming paycheck.  (*Id.* at 82-84).

[6] The City contends that "the distinction between 'City' and 'Private' details is not a legal distinction, is imprecise as a matter of law as evidenced by the fact that 'City' details have a different meaning under the [FLSA] and the Massachusetts Wage Law, and cannot be relied on as a basis to adjudicate any legal issue in this case."  (*See*, *e.g.*, Def. Resp. to Pl. SMF ¶ 15).

[7] That method of invoicing was established to try to resolve issues with delinquent vendors that were working for the City.  (E. Roche Dep. at 77-78).

[8] Because the City has moved to strike that paragraph of McGrath's affidavit, this statement is not undisputed.  However, the City does not appear to dispute the veracity of its contents.

When working a private detail, the third-party contractor determines the officers' arrival and departure times.  (McCarey Dep. at 94).  Plaintiffs working private details testified that upon arriving at a job site, they report to the foreman or supervisor of the third-party contractor.  (Clark Dep. at 88; Monaco Dep. at 106-07).  Plaintiffs also testified that the third-party contractors determine the tasks that they are to perform while at the job site.  (Clark Dep. at 88; McCarey Dep. at 94; Monaco Dep. at 106).  Some plaintiffs have not worked a single detail in the relevant period.  (*See, e.g.*, Dottin Dep. at 58; Gilberti Dep. at 105; Nardone Dep. at 57).

Since at least May 2014, the department has maintained a general order governing patrol officers who perform both City details and private details.  (First McGrath Aff. ¶ 20).  General Order 406 provides in part:

> Police Officers are first and foremost employees of the Somerville Police Department. That a private business is providing compensation to the city for the services of the Officer shall have no relevance in the performance of an Officer's official duties.  Officers have the primary responsibility of enforcing the law and protecting the safety of all.  This policy provides a set of comprehensive guidelines for the assignment of authorized Somerville Police Officers to paid detail assignments.  In addition, this policy also governs all Officers conduct, appearance, and sanctions/penalties for the violations of this policy while on an assigned detail.

(*Id.*; First McGrath Aff. Ex. E).

Police details are not included in the calculation of officers' regular rate of pay for purposes of overtime compensation.  (CBA Art. VI; CBA Art. VIII § 3).

### e.  Union Business Days

McGrath has served as the union president since 2009.  (McGrath Dep. at 97).  As the union president, he is permitted to reserve two of every four work shifts or tours of duty for union business without loss of pay or benefits.  (CBA Art. III § 6; McGrath Dep. at 106).  During union business days, he is typically doing business for the union and not police work, details, or

overtime.  (McGrath Dep. at 106).

**f.      Special Details for Federal Agencies**

Officers may assume special details for federal agencies, such as the Federal Bureau of

Investigation ("FBI") and the Drug Enforcement Administration ("DEA"), as part of their duties.

(Fallon Decl. ¶¶ 5-7; Oliveira Dep. at 14, 22).  John Oliveira is voluntarily employed on a long-

term assignment to an FBI task force.  (Oliveira Aff. ¶ 12; Oliveira Dep. at 14, 22).  James

"John" Hyde is voluntarily employed on a long-term assignment to the federal DEA.  (Fallon

Decl. ¶¶ 5, 7; Hyde Aff. ¶ 12).  The compensation of Oliveira and Hyde is determined by the

CBA.  (Hyde Aff. ¶ 22; Oliveira Aff. ¶ 22).  They typically report to their respective task-force

offices and perform most of their work on long-term assignments at the discretion of task-force

leaders.  (Fallon Decl. ¶¶ 8-9; Hyde Aff. ¶ 10; Oliveira Dep. at 25, 31).  They are occasionally

pulled from their long-term assignments to work directly with the police department under the

supervision of the chief of police and the City.  (Hyde Aff. ¶¶ 10, 14, 18-20; Oliveira Aff. ¶¶ 10,

14, 17-20).  The chief of police does not determine their job responsibilities within their

respective task forces.  (Oliveira Dep. at 24; Fallon Decl. ¶ 9).

While working with their respective agencies, Oliveira and Hyde are subject to the

general orders of the department at all times and are subject to discipline by the chief of police

and the City.  (Hyde Aff. ¶ 15; Oliveira Aff. ¶ 15).  They are also subject to the rules of their

respective federal agencies and may be removed at any time by agency management if those

managers become dissatisfied with their performance or for any other reason.  (*Id.*).

Oliveira and Hyde are imbued with the powers of their respective federal agencies, some

of which are not available to them in their roles for the City, such as tracking cell phones,

crossing jurisdictional boundaries into different municipalities, investigating crimes that

originate outside of the City, and effecting arrests outside of the City.  (Fallon Decl. ¶ 11;

Oliveira Dep. at 14-15).  They serve as liaisons between the City and their respective agencies

and provide the City with surveillance information and equipment that it does not otherwise

possess.  (Hyde Aff. ¶ 18; Oliveira Aff. ¶ 18).  The City has further benefited from their work

through the receipt of cash and asset forfeitures from individuals involved in drug crimes.  (Hyde

Aff. ¶¶ 16-17; Oliveira Aff. ¶¶ 16-17).

The scheduling of the duties of Oliveira and Hyde at their respective federal agencies is

controlled by police department management.  (Hyde Aff. ¶ 21; Oliveira Aff. ¶ 21).  For

example, the City requires them to request and obtain approval for paid time off for vacation,

personal days, sick days, or leaves of absence.  (*Id.*).  Their respective agencies have no role in

approving paid time off or leave.  (*Id.*).  However, Oliveira and Hyde will notify their respective

agencies when they take paid time off as a courtesy.  (*Id.*).

The City pays the weekly base salary of Oliveira and Hyde.  (Hyde Aff. ¶ 27; Oliveira

Aff. ¶ 27).  Their respective federal agencies do not monitor the compensation that the City pays

them.  (Hyde Aff. ¶ 28; Oliveira Aff. ¶ 28).  Both Oliveira and Hyde work overtime hours and

are entitled to overtime compensation under the CBA.  (Hyde Aff. ¶ 24; Oliveira Aff. ¶ 24).

Their respective agencies pay up to the first approximate $18,000 of their overtime compensation

each year.  (Hyde Aff. ¶ 28; Oliveira Aff. ¶ 28).  The police department has to approve any

overtime that they work because department approval is required for them to receive overtime

compensation.  (Hyde Aff. ¶¶ 24-25; Oliveira Aff. ¶¶ 24-25).

During the employment of Oliveira and Hyde, there have been two methods by which a

patrol officer may be assigned to a specialist position.  (Hyde Aff. ¶ 5; Oliveira Aff. ¶ 5).  Under

the "chief's pick" method, the chief of police offers a particular specialized assignment to an

individual patrol officer, and the officer has the option to accept or reject the offer.  (Hyde Aff. ¶ 6; Oliveira Aff. ¶ 6).  Under the "board-selection" method, the patrol officer submits a resume for the position.  (*Id.*).  A board, composed of two captains and two patrol officers, then interviews candidates and selects an officer for the assignment.  (Hyde Aff. ¶ 7; Oliveira Aff. ¶ 7).  Both Oliveira and Hyde were selected for their current positions by the chief of police, with agreement from their respective agencies.  (Fallon Decl. ¶¶ 6-7; Hyde Aff. ¶ 13; Oliveira Aff. ¶ 13).  Other positions within the department, such as patrol officer and traffic officer, are filled on the basis of bidding and seniority.  (Hyde Aff. ¶ 5; Oliveira Aff. ¶ 5).

### 2.    CBA and FLSA Discussions

In 2013, the City's personnel director, Candace Cooper, attended two courses that briefly addressed the FLSA.  (Cooper Dep. at 41-44).  Those courses discussed the interplay between the contractual provisions of a CBA and the FLSA and taught that unionized employees should be paid in accordance with the governing CBA.  (*Id.* at 46-47, 50, 57, 62).  The City's payroll director, Phyllis Shea, attended at least one of the same training sessions as Cooper, and was taught that a CBA supersedes the FLSA's method of calculating overtime.  (Shea Dep. at 18-19).

Neither plaintiffs nor the union questioned the legality of the CBA provisions governing the rate for overtime compensation until September 2016.  (Collins Decl. ¶¶ 5, 9; Cooper Decl. ¶¶ 4, 8).  In September 2016, union counsel emailed the City with specific questions about McGrath's paycheck.  (Buckley Decl. Ex. 20; Collins Decl. ¶ 6).  In October 2016, union counsel met with Collins and Cooper and questioned whether the City was correctly calculating McGrath's regular rate for the purposes of overtime compensation.  (Collins Decl. ¶ 7).  Those present at the meeting discussed the FLSA in connection with McGrath's compensation.  (First McGrath Aff. ¶ 41).  Union counsel also provided the City with a copy of *Murphy v. Town of*

*Natick*, 2009 WL 1364662 (D. Mass. May 14, 2019), a decision concerning the compensation of Natick police officers.  (Cooper Dep. at 84-85; First McGrath Aff. ¶ 41).

After the October 2016 meeting, the City researched the FLSA and calculated McGrath's pay for the week at issue, first using the FLSA method requested by union counsel, and then in accordance with the CBA.  (Cooper Decl. ¶ 5; Cooper Dep. at 133).  The City's calculations showed that McGrath had received more compensation under the CBA than he would have under the FLSA calculations.  (Cooper Decl. ¶ 6).  The City therefore concluded that McGrath was properly compensated.  (*Id.* ¶ 7; Collins Decl. ¶ 8).[9]

In October 2016, Cooper also researched the FLSA and contacted the Town of Natick to ask how it computes overtime for police officers.  (Cooper Dep. at 90, 132-33).  The Town responded on May 30, 2017, and attached its "FLSA Calculation Worksheet," which showed that the Town divided certain compensation by 1946.56, consistent with the court's ruling in *Murphy v. Town of Natick*.  (Cooper Dep. at 91-93; Cooper Dep. Ex. 36).

Following the October 2016 meeting, union counsel did not file a grievance or unfair labor practices charge concerning the overtime pay issue.  (Collins Decl. ¶ 8).  The City believed that the issue was resolved and received no further communication regarding the calculation of the overtime rate until plaintiffs filed this lawsuit on May 26, 2017.  (*Id.*; Cooper Decl. ¶ 8).

William Roche, the City's personnel director from 2012 to the fall of 2016 (when he was succeeded by Cooper), received e-mails throughout his tenure that provided alerts about FLSA concerns specific to municipalities.  (W. Roche Dep. at 11, 13, 60-61, 69-71).  In his capacity as personnel director and his previous positions working for the City, he had no memory of any

---

[9] The City contends that it reported the results of its review and conclusion that McGrath was properly compensated to union counsel.  Union counsel disputes that, contending that neither Collins nor anyone else on behalf of the City followed up in response to his concerns.  (Collins Decl. ¶ 8; Canzoneri Aff. ¶ 7).

communications or education about the FLSA or any overtime laws.  (*Id.* at 39, 70-71).  As personnel director, he did not know that there was a law that required the payment of overtime or specified how police officers were to be compensated.  (*Id.* at 39-40, 43-46, 61).

### 3.     911 Emergency Operators' Compensation

In April 2017, the City changed its payroll operating system.  (D'Angeli Dep. at 21). When the new operating system was implemented, it did not contain a pay code for paying overtime pursuant to the FLSA.  (Cooper Dep. at 77; D'Angeli Dep. at 218).  Within approximately a year after implementation, however, an FLSA pay code was created so that the City's 911 emergency operators would be paid overtime at the rate specified by the FLSA. (Cooper Dep. at 76-77; D'Angeli Dep. at 218).  The FLSA code includes all compensation paid to 911 operators, including weekly salary, longevity, and shift differential, in the computation of their overtime rate.  (D'Angeli Dep. at 219-20).  The City uses the FLSA overtime pay code when it chooses to compute overtime under provisions of the FLSA.  (Cooper Dep. at 76-77; D'Angeli Dep. at 216-17; Shea Dep. at 156-57).  However, the City never used the FLSA overtime pay code for police officers.  (Shea Dep. at 157).

### B.     Procedural Background

The second amended complaint was filed on January 31, 2018.  Count 1 asserts a claim under the FLSA for unpaid overtime.  Count 2 asserts a claim under the Massachusetts Wage Act that is entirely derivative of the FLSA claim—that is, plaintiffs allege that because the City violated the FLSA, it also violated the Wage Act.  Count 3 asserts a claim directly under the Wage Act for late payment of wages.  Both parties have moved for summary judgment as to a

variety of liability and damages issues.[10]

## II.    <u>Standard of Review</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

---

[10] The City also moved to strike plaintiffs' statement of material facts, based on the alleged inadmissibility of certain portions of affidavits submitted by plaintiffs.  That motion is the subject of a separate memorandum and order.

III.     **Analysis**

    A.     **Liability under Count 1 -- Fair Labor Standards Act**

        1.     **Plaintiffs Who Allegedly Did Not Work More Than 40 Hours**
            **in a Workweek**

The Fair Labor Standards Act requires an employer to compensate its employees "not less than one and one-half times the regular rate at which [the employee] is employed" for each hour worked in excess of 40 hours per workweek unless those employees are exempt.  29 U.S.C. §§ 207(a)(1), 213.[11]  As a general matter, "[a] claim for unpaid overtime wages must demonstrate that the plaintiffs were employed 'for a workweek longer than forty hours' and that any hours worked in excess of forty per week were not compensated 'at a rate not less than one and one-half times the regular rate.'"  *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 43-44 (1st Cir. 2013) (quoting 29 U.S.C. § 207(a)(1)).

The City contends that plaintiffs who have not worked more than 40 hours in a workweek—including plaintiffs McGrath, Oliveira, Hyde, Rego, and Ankenbauer—do not have a claim for overtime pay under the FLSA.

        a.     **McGrath**

As to McGrath, the City contends that union business days do not count toward the 40-hour threshold.  Plaintiffs concede this.  (Pls.' Opp. Mem. at 1).  However, they contend that McGrath can recover for the eight hours of overtime he worked on the week ending January 31, 2015.  Whatever the merits of that claim, it accrued on January 31, 2015, and the original complaint was filed on May 26, 2017.  The claim was filed outside the applicable limitations

---

[11] Somerville police officers are paid a base salary, rather than an hourly wage.  Section 13 of the FLSA provides exceptions to the overtime requirements, including an exception for salaried employees who serve executive, professional, or administrative functions.  29 U.S.C. § 213.  The parties do not dispute that given the job duties of the Somerville police, the exemptions to overtime requirements do not apply here.

period, which is two years, and is therefore time-barred.  29 U.S.C. § 255.  Accordingly,

summary judgment will be granted to the City on the FLSA claim of McGrath for unpaid

overtime wages.

**b.      Oliveira and Hyde**

As to Oliveira and Hyde, the City contends that the work they performed when assigned

to long-term details with outside federal agencies is excluded from the regular rate calculations

by the "special detail work" exemption in 29 U.S.C. § 207(p)(1).  Under § 207(p)(1), if a state

law-enforcement employee "solely at such individual's option[] agrees to be employed on a

special detail by a separate and independent employer in . . . law enforcement, or related

activities," then the hours that employee works for the outside employer are excluded from

FLSA overtime calculations for the first employer.  29 U.S.C. § 207(p)(1).  "Section [207(p)(1)]

applies . . . provided (1) [t]he special detail work is performed solely at the employee's option,

and (2) the two employers are in fact separate and independent."  29 C.F.R. § 553.227.  Plaintiffs

contest whether both requirements have been met.

First, plaintiffs contend that the work of Oliveira and Hyde for their respective details is

not performed "solely" at their "option."  They assert that an employee's special detail work is

"performed solely at [his] option" only if he alone has the authority to exercise that option.

Otherwise, they contend, the statutory language would be superfluous; there would be no need

for an employee to "agree[] to be employed" on a detail "solely at such individual's option."

(Pls.' Opp. Mem. at 10-11).  But that interpretation runs contrary to common sense.  In plaintiffs'

view, the special-detail exemption would apply only where a police officer unilaterally decides

whether to join or leave a special detail—with no request from the detailing agency and indeed

even if it does not consent.  That interpretation is also at odds with the regulations issued under §

16

207(p)(1), which permit the primary employer to play a role in special detail selection.  *See* 29

U.S.C. § 553.227 ("For example, a police department may maintain a roster of officers who wish

to perform such work.").  For those reasons, courts have interpreted that requirement to simply

mean that an employee's placement on a special detail was voluntary.  *See Lemieux v. City of*

*Holyoke*, 740 F. Supp. 2d 246, 256 (D. Mass. 2010); *Clark v. City of Ft. Worth*, 800 F. Supp. 2d

781, 787 (N.D. Tex. 2011), *aff'd sub nom.* 464 F. App'x 325 (5th Cir. 2012); *Cox v. Town of*

*Poughkeepsie*, 209 F. Supp. 2d 319, 324-25 (S.D.N.Y. 2002).  Here, because there is no dispute

that Hyde and Oliveira voluntarily work on their respective special details, that work is

"performed solely at [their] option" within the meaning of § 207(p)(1).

Next, plaintiffs contend that the FBI and DEA are not "separate and independent" from

the City.  Neither the statute nor the regulation explicitly defines "separate and independent."

*Clark*, 800 F. Supp. 2d at 787.  "However, courts addressing the issue have considered the

following factors: '(1) whether the agencies maintained separate payrolls; (2) whether the entities

had arms-length dealings regarding employment; (3) whether the agencies had separate budgets;

(4) whether the employees of the entities participate in separate retirement programs; (5) whether

they are independent entities under state statute; and (6) whether they can both sue and be

sued.'"  *Murphy v. Town of Natick*, 516 F. Supp. 2d 153, 157-58 (D. Mass. 2007) (quoting

*Barajas v. Unified Gov't of Wyandotte County/Kansas City*, 87 F. Supp. 2d 1201, 1207 (D. Kan.

2000)).  "The degree to which one employer exerts budgetary control over another is typically

given special weight." *Id.* (citing *Nolan v. City of Chicago*, 125 F. Supp. 2d 324, 337 (N.D. Ill.

2000)).[12]

---

[12] Plaintiffs contend that the City and FBI and DEA are "joint employers" under 29 U.S.C. § 791.2 and thus cannot be "separate and independent" within the meaning of § 207(p).  But that argument conflates two separate inquiries.  A municipality that is an officer's joint employer must compensate him for his overtime under the FLSA,

All of those factors strongly suggest that the FBI and DEA are separate and independent from the City for the purposes of § 207(p)(1).  They are separate entities created under federal law.  *See* 28 U.S.C. §§ 531-533; 21 U.S.C. §§ 801-71.  As federal agencies, they have separate budgets and do not depend on the City for "funding, budget approval, and other fiscal matters." *See Nolan*, 125 F. Supp. 2d at 337 (concluding municipal agencies were separate and independent from the city because they had separate budgets).  They maintain separate payrolls. (S*ee* Hyde Aff. ¶¶ 26-28; Oliveira Aff. ¶¶ 26-28).  And, as departments of the federal executive branch, they may sue and be sued separately from the City, albeit only if the United States consents.  *See Hawaii v. Gordon*, 373 U.S. 57, 58 (1963).

Plaintiffs contend that because Hyde and Oliveira do not perform their work for the FBI and DEA during off-duty hours, those agencies are not "separate and independent" employers within the meaning of the law.  (Hyde Aff. ¶ 23; Oliveira Aff. ¶ 23).  It is true that the relevant regulation, 29 C.F.R. § 553.227, states in general terms that § 207(p)(1) "makes special provision for . . . law enforcement employees of public agencies who, at their own option, perform special duty work in . . . law enforcement or related activities for a separate and independent employer (public or private) during their off-duty hours."  At least two courts have held that whether the work was performed during off-duty hours is a factor in determining whether the employee was working for an independent and separate employer.  *See Specht v. City of Sioux Falls*, 639 F.3d 814, 822-23 (8th Cir. 2011) (holding that § 207(p)(1) may not apply where, among other things, firefighters' detail work "included their normal shift days and hours"); *Crow v. City of Derby*, 1992 WL 363682, at *2 (D. Kan. 1992) (holding that § 207(p)(1) did not apply where plaintiff worked for other police departments at the direction of his employer department).  But that fact

---

but even then, the exemption in § 207(p) may still apply.  *See Cox*, 209 F. Supp. 2d at 323-25 (finding that defendant jointly employed officers, and then analyzing whether § 207(p) applied).

is not dispositive, and certainly does not outweigh the other factors tending to show that the FBI and DEA are separate and independent from the City.  Accordingly, based on the undisputed evidence, the FBI and DEA are separate and independent agencies within the meaning of § 207(p)(1).

Under the circumstances, the work performed by Oliveira and Hyde for the FBI and DEA is excluded by the "special detail work" exemption in 29 U.S.C. § 207(p)(1).  Summary judgment in favor of the City is therefore appropriate as to their claims for overtime under the FLSA.

### c.       **Rego and Ankenbauer**

The City further contends that at least two additional plaintiffs—Rego and Ankenbauer—have not worked more than 40 hours in a workweek during the relevant two-year limitations period.  Plaintiffs do not dispute this.  (Pls.' Opp. Mem. at 11).  Accordingly, summary judgment will be granted to the City as to the claims of Rego and Ankenbauer for unpaid overtime under the FLSA.

### 2.       **The Threshold for Determining Plaintiffs' Eligibility for Overtime Compensation**

The City next contends that Congress created a unique overtime threshold for police officers under 29 U.S.C. § 207(k), and that it does not owe overtime to plaintiffs until they have worked at least 43 hours in a workweek.  It specifically contends that the City operates a seven-day "work period" within the meaning of the statute.  It also contends that plaintiffs' union has conceded the application of § 207(k) in a pending parallel proceeding at the Department of Labor Relations ("DLR"), and thus plaintiffs are barred by issue preclusion from taking a contrary position here.

Plaintiffs have cross-moved on that issue, contending that overtime liability was incurred

because (1) the 7-day/40-hour standard set forth in § 207(a) of the FLSA applies, not the 7-day/43-hour standard set forth in § 207(k); and (2) even if § 207(k) applies, the City has failed to demonstrate the existence of a seven-day § 207(k) "work period."

The text of § 207(k) is not a model of clarity.[13]  In substance, however, it provides that if a public agency creates a "work period" for law enforcement officers of between 7 and 28 days, overtime need not be paid until a certain proportionate threshold is reached.  For law enforcement officers on a seven-day work period, that threshold is 43 hours.  29 C.F.R. § 553.230.  "The work period requirement is ordinarily not a high hurdle. Virtually any bona fide, fixed, recurring period of between 7 and 28 days will suffice." *O'Brien v. Town of Agawam*, 350 F.3d 279, 291 n.21 (1st Cir. 2003) (citing 29 C.F.R. § 553.224(a)).  An employer is not required to inform its employees that it has established a § 207(k) work period.  *See Calvao v. Town of Framingham*, 599 F.3d 10, 15-18 (1st Cir. 2010).

As an initial matter, plaintiffs are not barred by issue preclusion from asserting their claims.[14]  Among other things, issue preclusion requires a "final judgment on the merits in the

_____

[13] Section 207(k) provides as follows:

> No public agency shall be deemed to have violated subsection (a) with respect to the employment of . . . any employee in law enforcement activities . . . if --

> (1) in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or

> (2) in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days, compensation at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(k).

[14] It appears that the City intended to assert a defense of judicial estoppel, not issue preclusion, based on the sworn statements of McGrath in the DLR case.  Judicial estoppel generally prevents a party who successfully adopts a position in one legal proceeding from taking the contrary position in a later proceeding after circumstances have changed.  *See InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003).  For judicial estoppel to apply, however,

prior adjudication." *Kobrin v. Bd. of Registration in Med.*, 444 Mass. 837, 843 (2005).  The City has not cited to any final decision by the DLR, and indeed there does not appear to be one.[15]

The question, then, is whether the City in fact operated a seven-day work period, both as to officers on a "four-and-two" schedule and those on a "five-and-two" schedule.  Those are separate questions, because an employer may have different work periods applicable to different employees.  *See O'Brien*, 350 F.3d at 292 (citing 29 C.F.R. § 553.224(b)).

For plaintiffs who work a "four-and-two" schedule, the City has not established by the undisputed evidence that it operated a § 207(k) work period.  Under the terms of the CBA, officers on a "four-and-two" schedule work a six-day work week; they work four consecutive days and then receive two days off.  (*See* CBA Art. VIII, § 2).  In *O'Brien v. Town of Agawam*, the First Circuit held that the defendant town, which had adopted a similar "four-two" schedule in its CBA, had not established the existence of a § 207(k) work period.  350 F.3d at 290-291.  The court reasoned that while in theory a town could adopt a work period that differed from the work schedule in its CBA, the record did not show it had done so.  *Id.*  Here, the City's only evidence that it operates a work period different from the CBA work schedule is testimony by its payroll employees that they use a seven-day pay period.  A work period, however, "need not coincide with the duty cycle or pay period. . ."  29 C.F.R. § 553.224.[16]  On this record, there is a genuine dispute of material fact as to what length work period the City operated.  Accordingly,

---

the party's earlier and later positions must be inconsistent.  *See New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).  As set forth in the Court's memorandum and order on the City's motion to strike, McGrath's statements are not sufficiently inconsistent to trigger the operation of the doctrine.

[15] *See* MASS. DEP'T OF LABOR RELATIONS, *DLR Hearing, CERB & Arbitration Decisions*, https://www.mass.gov/service-details/dlr-hearing-officer-cerb-arbitration-decisions (last visited Sep. 30, 2019).

[16] In the only case cited by the City, an agreement between the parties set both the pay period and the work period at 14 days.  *See Callahan v. City of Sanger*, 2015 WL 2455419, at *11 (E.D. Cal. 2015).  Here, by contrast, the City's claimed seven-day pay period was not set by the CBA and it appears to be inconsistent with the six-day work schedule set there.

summary judgment is inappropriate as to the claims of officers on a "four and two" schedule.

However, as to plaintiffs who work a "five-and-two" schedule, the undisputed facts establish that the City did in fact operate a § 207(k) work period.  Under the terms of the CBA, officers on a "five-and-two" schedule work a seven-day work schedule; they work five consecutive days and then receive two days off.  (*See* CBA Art. VIII, § 2).  Plaintiffs contend that officers on a "five-and-two" schedule do not consistently work a seven-day period because they occasionally take extra days off.  But whether an officer takes extra days off in a particular work period is not material; an occasional "four-and-three" or "zero-and-seven" schedule still amounts to a seven-day work period.  Otherwise, no municipality whose employees took a substantial vacation could successfully operate a § 207(k) work period.[17]  Accordingly, the undisputed evidence shows that the City operated a seven-day work period under § 207(k) as to those plaintiffs who worked a "five-and-two" schedule.  *See O'Brien v. Town of Agawam*, 491 F. Supp. 2d 170, 173-74 (D. Mass. 2007) (holding defendant operated a § 207(k) work period for plaintiffs on a "five-and-two" schedule).

Finally, plaintiffs contend that the City is required by 29 C.F.R. § 553.51 to keep records for any § 207(k) work period and that it failed to do so.  It is at best unclear whether compliance with § 553.51 is necessary to establish a § 207(k) work period.  *See McGrath v. City of Philadelphia*, 864 F. Supp. 466, 477-78 (E.D. Pa. 1994).  In any event, the CBA's provisions concerning work schedules and the City's payroll records are sufficient to prove the existence of a work period—that is, they "provide the information sought by the regulation, namely the length of the exemption period, the officers to whom it applies, and the regularly scheduled shifts of the

---

[17] For example, under plaintiffs' logic, a municipality that operated an 11-day work period would not qualify if some of its employees occasionally took a five-day vacation, because that would mean those employees occasionally worked six or fewer days and so the municipality did not operate a regular, recurring seven-day work schedule pattern.  (*See* Pl. Mot. in Supp. at 28).

officers." *Adair v. City of Kirkland*, 185 F.3d 1055, 1061-62 (9th Cir. 1999).

Accordingly, to the extent the City's motion seeks summary judgment that it established a § 207(k) work period, it will be denied as to the claims of officers on a "four-and-two" work schedule and granted as to the claims of officers on a "five-and-two" work schedule.

### 3.    The Denominator for Calculating the Regular Hourly Rate

"Calculation of the correct 'regular rate' is the linchpin of the FLSA overtime requirement." *O'Brien*, 350 F.3d at 294.  It matters because "an employee who works overtime is entitled to be paid 'at a rate not less than one and one-half times the regular rate at which he is employed.'"  *Id.* (quoting 29 U.S.C. § 207(a)(1)).

Under the FLSA, the employee's "regular rate" of pay is calculated as the "hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed. . ." 29 C.F.R. § 778.108 (citing *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419 (1945)).  "If the employee is employed *solely* on the basis of a single hourly rate, the hourly rate is the 'regular rate.'"  29 C.F.R. § 778.110 (emphasis added).  "If the employee is employed *solely* on a weekly basis," the regular rate is computed based on the number of hours which the salary is intended to compensate.  29 C.F.R. § 778.113 (emphasis added).

"Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts." *Walling*, 325 U.S. at 424-425.  That mathematical computation consists of dividing an employee's total remuneration by the number of hours worked for which that compensation was paid.  29 C.F.R. § 778.109.  In other words, calculation of the "regular rate" requires both a numerator (the amount of compensation) and a denominator (the hours worked).

Here, the officers were neither employed solely on the basis of a single hourly rate, nor solely on the basis of a weekly salary. Part of their compensation resembles an ordinary weekly salary: each week, the City pays officers 1/52 of their annual salary plus a pro-rated portion of their night-availability differential and educational-incentive payment. (CBA Art. XIX; D'Angeli Dep. at 32-33). However, the City also pays additional compensation for details and overtime, which varies with the number of hours worked.[18]  Again, under § 778.109, the denominator is "the total number of hours actually worked by [an employee] in that workweek for which such compensation was paid." That will vary as to each individual officer.

Citing *Murphy v. Town of Natick*, 2009 WL 1364662 (D. Mass. May 14, 2009), plaintiffs allege that their base salary is intended to compensate them for 1,946.56 hours annually—in other words, that all officers have that same fixed amount of base hours. It is true that the *Murphy* court held that the appropriate denominator in that case was 1,946.56. *Id.* at *2. However, the plaintiff officers in that case had received overtime pay only for hours worked in excess of 40 per week. *Id.* at *1. That is, the only overtime pay the plaintiffs would have received would qualify as overtime under the FLSA and thus be excluded from regular wage calculations. There is no indication in the decision that those plaintiffs received variable pay, and thus the decision is not applicable here.

In short, the actual denominator will depend on the actual overtime and detail hours worked by each officer. That number is necessarily an individualized calculation, not a fixed

---

[18] The CBA labels such extra pay as detail or overtime pay, but "[f]or the purposes of the CBA, all hours worked under the statutory maximum are non-overtime labor." *O'Brien*, 350 F.3d at 289 (citing 29 C.F.R. § 778.101). Until an officer works more than the statutory maximum, any additional detail or CBA-defined overtime pay that does not exceed the employee's regular rate "is simply considered straight-time compensation under the Act." *See id.* Thus, if in a given week a plaintiff has worked details or overtime as defined by the CBA, but has not exceeded the FLSA statutory maximum hours, that detail or overtime pay must be included in the calculation of her regular rate. *See id.* (concluding that "overtime" paid to officers under CBA must be included as part of their regular hourly compensation).

number applicable to all officers.  To the extent that plaintiffs seek summary judgment in their

favor on the basis that the same denominator is applicable to all officers, it will be denied.

### 4.    The Inclusion of Wage Augments

Generally, an employee's regular rate "shall be deemed to include all remuneration for

employment paid to, or on behalf of, the employee."  29 U.S.C. § 207(e).  Section 207(e)

enumerates various exceptions to this rule, including, for example, such things as contributions

to benefit plans.  *See* § 207(e)(4).

Here, the parties dispute whether plaintiffs' regular rate must include seven wage

augments that the City pays to officers.  Those seven wage augments are:  (1) a night-shift

differential; (2) a longevity bonus; (3) a senior longevity bonus; (4) a weekend differential; (5) a

weapons-qualification stipend; (6) a weapons-of-mass-destruction stipend; and (7) an education

incentive.  Plaintiffs contend that all seven augments must be included in their regular rate.  The

City contends that the parties agreed in the CBA to exclude those augments from overtime

calculations and that, in any event, six of the seven (all except the weekend differential) are

excluded by law.

An employer and its employees cannot, by agreement, exclude compensation from the

FLSA's definition of a regular rate.  In calculating FLSA overtime, "the regular rate cannot be

stipulated by the parties; instead, the rate must be discerned from what actually happens under

the governing employment contract."  *O'Brien*, 350 F.3d at 294 (citing 29 C.F.R. § 778.108; *Bay*

*Ridge Operating Co. v. Aaron*, 334 U.S. 446, 462-63 (1948)).  Accordingly, the CBA's exclusion

of the seven wage augments from the regular-rate calculations may be disregarded.[19]

---

[19] The City cites two cases in which courts have enforced parties' definition of what to include in a regular rate.  In both of those cases, however, the court relied upon the agreement to include compensation that would not otherwise be included.  *See Wheeler v. Hampton Twp.*, 399 F.3d 238, 245 (3d Cir. 2005); *O'Brien*, 482 F. Supp. 2d at 117.  Here, the City asks the opposite.

Furthermore, and in any event, the First Circuit has held that five of the seven wage augments are of the type that must be included in an employee's regular rate.  In *O'Brien*, the court held that shift differentials, longevity bonuses, and education incentives must all be included in the definition of an FLSA regular rate.  *See* 350 F.3d at 294-97.  Accordingly, the night-shift differential, longevity bonus, senior longevity bonus, weekend differential, and education incentive must be included in the regular rate here.

Based on the reasoning of *O'Brien*, the weapons-qualification stipend and weapons-of-mass-destruction stipend must also be included in plaintiffs' regular rate.  As sums paid in recognition of skills or qualifications, they are analogous to educational-incentives payments.  *See Murphy*, 516 F. Supp. 2d at 157 (holding that bonuses for technological proficiency due under a CBA must be included in plaintiffs' regular rate).  Because these stipends "are mandated by the CBAs and are indisputably 'remuneration for employment paid to, or on behalf of, the employee'" they must be included in the regular rate.  *Id.*

The City nonetheless contends that all seven wage augments are exempt under § 207(e)(1) and (2).  Section 207(e)(1) excludes sums paid as "gifts" and "payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service. . ."  Section 207(e)(2) excludes "payments made for occasional periods where no work is performed," "reasonable payments for traveling expenses," and "other similar payments to an employee which are not made as compensation for his hours of employment."  Even under a fair reading of FLSA exemptions, the City's claimed exclusions do not apply.  Neither section applies on its face.  Moreover, by regulation, § 207(e)(1) does not include any "bonus[] paid pursuant to contract (so that the employee has a legal right in the payment and could bring suit to enforce it)," which applies to all seven wage augments.  29 C.F.R. § 778.212.

Accordingly, plaintiffs' motion for summary judgment will be granted to the extent it contends that the City violated the FLSA by failing to include the seven wage augments in its calculation of plaintiffs' regular rate of pay.

### 5.    The Inclusion of Roll Call Time

Plaintiffs contend that the City violated the FLSA by failing to compensate them for, and failing to include in the overtime calculation, a period of 15 minutes that officers assigned to the patrol division spend each shift attending roll call.  The City, however, counters that roll call is compensated by the officers' base salary, and that there is no basis for excluding roll call from the hours that it is intended to compensate.

Here, disputed issues of fact preclude summary judgment.  The CBA does not clearly address whether time spent at roll call is compensated by the officers' base salary.  *Compare Rosano v. Township of Teaneck*, 754 F.3d 177, 192 (3d Cir. 2014).  On one hand, it says the "regular work day" is "exclusive of not more than fifteen (15) unpaid minutes for roll call." (CBA Art. VIII, § 1).  That would suggest that the salary does not include time at roll call.  On the other hand, the CBA lists roll-call time as one type of "regularly scheduled tour of duty or work shift" and excludes it from the definition of overtime service, which suggests that the officers' ordinary, compensated duties include roll-call attendance.  (*See* CBA Art. VIII, § 3). The deposition testimony of two patrol officers—one of whom was uncertain—that they believe roll call time was compensated does not resolve that ambiguity.  (*See* Monaco Tr. at 15; McDaid Tr. at 63).  Both parties' motions for summary judgment as to that issue will therefore be denied.

### 6.    The Inclusion of Compensation for Details

Plaintiffs contend that the City violated the FLSA by failing to include compensation paid for city details at the "regular detail rate" plus any non-premium hourly pay differential

added to the regular detail rate in the calculation of FLSA overtime.  In other words, they contend that the regular detail rate should be included as part of their regular compensation.

As  noted, Section 207(p)(1) exempts "special detail" hours worked by law enforcement personnel from FLSA overtime calculations; that section applies "provided (1) [t]he special detail work is performed solely at the employee's option, and (2) the two employers are in fact separate and independent."  29 C.F.R. § 553.227.  The parties do not dispute that all detail work, whether paid for by City entities or others, is voluntary.  (*See* CBA Art. VI, § 1).  Instead, the question is whether details performed for contractors, even if ultimately for the City's benefit, are worked for separate and independent employers.

As also noted, courts have relied on six factors to decide if employers are separate and independent:  whether the employers "(1) maintain separate payrolls, (2) deal with other employers at arms' length concerning the employment of any individual, (3) have separate budgets and (4) separate retirement systems, (5) are independent entities under state law, and (6) can sue and be sued in their own names."  *Clark*, 800 F. Supp. 2d at 787 n.3.

Here, all six factors indicate that the City and the private detail contractors are separate and independent employers.  They maintain separate payrolls, separate budgets, and separate retirement systems. (*See* Bean Decl. ¶¶ 4-6)  Several of the private contractors are separate entities that may sue and be sued in their own name.  (*See* Def.'s Add'l SMF & Pls.' Resp. ¶¶ 83-84).  It is true that the City deals with private contractors at arms' length:  the third-party contractors dictate officers' arrival and departure times and tasks directly to the officers.  *See Clark*, 800 F. Supp. 2d at 784-85, 788.  The City retains some control over details; it collects payments for details for contractors and distributes it to officers, and it requires officers to abide by department standards and continue to enforce the law while on detail.  All of that is permitted

by 29 C.F.R. § 553.227(d), however, and "do[es] not raise a fact issue that defendant is the off-duty employer." *See id.*

In summary, the City and private contractors are separate and independent employers. City details are therefore exempted by § 207(p)(1), and need not be counted as regular compensation.

The City further contends that certain details worked for other City departments should be excluded under 29 U.S.C. § 207(e)(7).  Section 207(e)(7) excludes from FLSA overtime calculations any "extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or [CBA] for work outside of the hours" set by the contract if that premium rate "is not less than one and one-half times the rate established" by the contract.  An employer may credit this extra compensation "toward overtime compensation due under [§ 207(a)] for work in excess of the applicable maximum hours standard."  29 C.F.R. § 778.201.

Although plaintiffs argue to the contrary, applying § 207(e)(7) requires a case-by-case analysis.  It is true that the detail rate applies uniformly to all officers, even if that rate has increased over time.  However, officers' base hourly rates under the CBA may vary substantially, due, among other things, to differences in any of the seven wage augments discussed above.  Therefore, determining how much detail pay must be excluded from FLSA regular wages, and then credited against the City's overtime liability, depends on the hourly rates of individual officers.[20]  Because such officer-by-officer calculations rely on disputed facts, specifically individual officers' base hourly pay and detail schedules, they are not susceptible of

---

[20] Plaintiffs propose a simpler methodology:  taking the weighted average of officers' base hourly rates and the uniform detail rates.  *See* 29 C.F.R. § 778.115.  However, that method assumes the entirety of officers' detail pay must be included in their regular rate, and § 207(e)(7) expressly excludes some detail pay as "extra compensation." For that reason, that approach is not appropriate.

summary judgment.

Accordingly, plaintiffs' motion for summary judgment will be denied as to the claims that the City's detail pay practices violated the FLSA.

### B.      Count 2 – Massachusetts Wage Act Claims Based on FLSA Violations

In Count 2, plaintiffs claim concurrent violations of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148.  In substance, plaintiffs contend that FLSA liability under Count 1 triggers liability and treble damages under the timely-pay provision of the Wage Act.

The Massachusetts Wage Act provides that "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him . . . ."  Mass. Gen. Laws ch. 149, § 148.  To establish a claim for unpaid wages under the statute, a plaintiff must show that (1) he was an employee under the statute, (2) his form of compensation constitutes a wage under the statute, and (3) the defendants violated the Act by not paying him his wages in a timely manner.  *Stanton v. Lighthouse Fin. Servs., Inc.*, 621 F. Supp. 2d 5, 10 (D. Mass. 2009) (citing *Allen v. Intralearn Software Corp.*, 2006 Mass. App. Div. 71, 2006 WL 1277813 at *1 (2006)).

However, the FLSA "is the exclusive remedy for enforcement of rights created under the FLSA."  *Roman v. Maietta Const., Inc.* 147 F.3d 71, 76 (1st Cir. 1998).  "That is, the plaintiff cannot circumvent the exclusive remedy prescribed by Congress by asserting equivalent state claims in addition to the FLSA claim."  *Id.* (quotations omitted).

Several courts in this district have nonetheless held that claims under the Massachusetts timely-pay provision "premised exclusively on FLSA violations are not duplicative of FLSA claims and not preempted."  *Chavira v. OS Rest. Servs., LLC*, 2019 WL 917226, at *2 (D. Mass. Feb. 25, 2019) ("The *Roman* holding, however, does not clearly control here where the relevant

30

section of the Wage Act, which concerns the timeliness of wages paid under state and federal

law, is not an equivalent claim."); *see also Lambirth v. Advanced Auto, Inc.*, 140 F. Supp. 3d

108, 110-13 (D. Mass. 2015); *Carroca v. All Star Enters. & Collision Ctr., Inc.*, 2013 WL

3496537, at *3-4 (D. Mass. July 10, 2013).  Those courts have permitted timely-pay claims for

overtime due under the FLSA even where the plaintiff could not recover under the Massachusetts

overtime law.  *See Lambirth*, 140 F. Supp. 3d at 110;  *Carroca*, 2013 WL 3496537, at *3.

     Whatever the merits of that position, municipal immunity requires a different result here.

Municipalities are immune from state-law claims for overtime under Mass. Gen. Laws ch. 151, §

1A.  *See Burns v. City of Holyoke*, 881 F. Supp. 2d 232, 237 (D. Mass. 2012); *Lemieux v. City of

Holyoke*, 740 F. Supp. 2d 246, 259-261 (D. Mass. 2010); *see also Grenier v. Town of

Hubbardston*, 7 Mass. App. Ct. 911 (1979) (rescript).[21]  Permitting plaintiffs to treble their

recovery for federal-law overtime claims—even though the City is immune to state-law overtime

claims—would simply circumvent the City's municipal immunity, and is therefore

impermissible.

     Accordingly, the City's motion for summary judgment will be granted to the extent that

Count 2 seeks treble damages for any overtime due under the FLSA, and plaintiffs' cross-motion

as to the same issue will be denied.

**C.**     **Count 3 – Massachusetts Wage Act Claims Based on State-Law Violations**

     The City has moved for summary judgment as to Count 3, which asserts claims under the

---

[21] Municipal immunity "is deeply anchored in the law of the Commonwealth."  *Lemieux*, 740 F. Supp. 2d at 260.  Consent to sue a municipality "will be assumed only where it has been 'expressed by the terms of a statute, or appears by necessary implication from them.'"  *Id.* (quoting *Locator Servs. Group, Ltd. v. Treasurer & Receiver Gen.*, 443 Mass. 837, 858 (2005)).

Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148.[22]  Plaintiffs have cross-moved on a number of issues arising under the Wage Act.

### 1.    <u>Timeliness of Pay for City Details</u>

Plaintiffs first contend that city details are not timely paid under the Wage Act if paid more than six days after the pay period in which they earned such compensation.  The City, however, contends that the CBA, which calls for payment within 21 days, governs the timing for payment.

As a general matter, "[a]n agreement to circumvent the Wage Act is illegal even when 'the arrangement is voluntary and assented to.'"  *Melia v. Zenhire, Inc.*, 462 Mass. 164, 170 (2012).  However, while "waiver of Wage Act provisions is strongly disfavored," public employees "have long been explicitly granted the ability to . . . alter the manner of their payments."  *Parris v. Sheriff of Suffolk Cty.*, 93 Mass. App. Ct. 864, 867.  Thus, public employee unions "may act on behalf of their members to exercise the employees' election under the Wage Act" by setting "a negotiated version of a different time period for payment . . . through their collective bargaining representatives."  *Id.* at 868-69.  In short, while private parties to an employment contract may not waive the protection of the Wage Act, public employees may alter the time period by means of a CBA.

The parties, however, dispute which CBA provision is relevant.  Article VI, § 11 provides that the City shall pay for details out of a "special detail fund in accordance with the provisions of [the Municipal Finance Law, Mass. Gen. Laws ch. 44, § 53C], into which *all money received from police paid details* is deposited," and shall make payment within 21 days.  CBA Art. VI,

---

[22] The City does not have immunity as to the Wage Act claim in Count 3.  Unlike the overtime section of the Wage Act, the timely-pay provision of the Act waives the immunity of municipalities.  *See* Mass. Gen. Laws ch. 149, § 148.

§ 11 (emphasis added).[23]  The City contends this provision sets a 21-day period for all details. Plaintiffs contend that because the Municipal Finance Law only applies to details performed for third parties, the 21-day period controls only payments for those types of details, and not city details.  *See Malden Police Patrolman's Ass'n v. Malden*, 92 Mass. App. Ct. 53, 62-63 (2017).

Article VI, § 11 of the CBA is ambiguous.  The statutory reference is not particularly instructive.  It is included without explanation, and exactly what details are covered by ch. 44, § 53C was unclear even several years after the CBA was executed.  *See id.* (noting "there is no case law governing the interplay between the Wage Act, [Mass. Gen. Laws ch.] 149, § 148, and the municipal finance law, [Mass. Gen. Laws ch.] 44, § 53C").

As to the text of § 11 itself, it can be read in either party's favor.  As the City points out, nowhere does § 11 limit its application to details performed for third parties; it refers only to "police paid details."  *Cf. id.* at 54 n.1 (referring to both details performed for Malden and third parties as "paid details").  Yet § 11 also provides that "[u]nder no circumstances shall the City be required to pay for paid details worked out of City funds other than moneys received from vendors . . . ."  (CBA Art. VI, § 11).  That language suggests that § 11 may cover only details worked for third parties.  Furthermore, the fact that § 11 does not explicitly refer to the requirements of the Wage Act somewhat undermines the conclusion that it was meant to amend those requirements.  *Cf. Parris*, 93 Mass. App. Ct. at 867.

---

[23] Mass. Gen. Laws ch. 44, § 53C provides in part as follows:

> All money received by a city . . . as compensation for work performed by one of its employees on an off-duty work detail which is related to such employee's regular employment or for special detail work performed by persons where such detail is not related to regular employment shall be deposited in the treasury and shall be kept in a fund separate from all other monies of such city . . . and . . . shall be expended . . . in such manner and at such times as shall, in the discretion of the authority authorizing such off-duty work detail or special detail work, compensate the employee or person for such services; provided, however, that such compensation shall be paid to such employee or person no later than ten working days after receipt by the city . . . of payment for such services.

On this record, a reasonable factfinder could hold in either party's favor as to whether the CBA amended the payment period for city details.  Accordingly, plaintiffs' motion for summary judgment as to that issue will be denied.

## 2.      Timeliness of Pay for Private Details

Plaintiffs further contend that because payments for private details that were made more than 21 days after the date worked, those payments were untimely under the Municipal Finance Law.

As noted, the Municipal Finance Law "provides that compensation for off-duty detail work shall be paid to an employee 'no later than ten working days after receipt by the city.'" *Malden Police*, 92 Mass. App. Ct. at 64 (quoting Mass. Gen. Laws ch. 44, § 53C).  In *Malden*, the court held that the Municipal Finance Law's ten-day time period, rather than the Wage Act's six-day time period, governed claims for payment for details performed on behalf of third parties.  *Id.*  Interpreting the two statutes, the court held that the Municipal Finance Law was not "incompatible with the Wage Act," and that its longer pay period "signals an awareness by the Legislature that when compensation for detail work is coming from a third party, a city's prompt payment of wages to officers who have performed such work may be delayed."  *Id.*  The court noted that, where possible, "the two statutes should be construed and applied harmoniously" if they did not conflict—a contention not raised by the plaintiffs in that case.  *Id.* at 62 n.13.  The court also indicated that public employees may alter the Municipal Finance Law's ten-day period by a CBA, *id.* at 65, just as the *Parris* court held permissible for the Wage Act's six-day period, *see Parris*, 93 Mass. App. Ct. at 867.

Accordingly, the time period set in the CBA supersedes either or both the six-day time period of the Wage Act or the ten-day time period of the Municipal Finance Law.  *See Malden*

*Police*, 92 Mass. App. Ct. at 65;  *Parris*, 93 Mass. App. Ct. at 867.  Whether the City timely paid plaintiffs for private details is thus properly determined under the CBA's 21-day time period.

However, disputed issues of material fact exist as to whether the City actually paid all of the plaintiffs on all of their claims within 21 days.[24]  The 21-day period for detail payment under the CBA only starts "after a detail has been worked and the proper documentation therefore submitted."  (CBA Art. VI, § 11).  When officers submitted their detail documentation, and thus when the CBA's 21-day period started to run, cannot be determined except on an individual basis.  (*See* E. Roche Dep. at 38, 104 (officers turned in detail slips up to months after a detail); Elpidoforos Dep. at 90 (up to two days after a detail); Monaco Dep. at 117-18 (upon next visit to station); Clark Dep. at 98 (on same day as detail)).  Accordingly, a genuine issue of material fact exists as to whether the City complied with the CBA's 21-day time period.

Accordingly, both plaintiffs' and defendant's motions for summary judgment as to that issue will be denied.

### D.    FLSA Damages

In addition to its motion for summary judgment on the merits of plaintiffs' claims, the City contends that it is entitled to summary judgment as to certain issues concerning the proper measure of any FLSA damages.  Plaintiffs have also cross-moved as to certain damages issues.

#### 1.    Statute of Limitations and Willfulness

The statute of limitations for FLSA actions is set forth in 29 U.S.C. § 255.  "Under the [FLSA], an action for unpaid compensation must commence within two years after a cause of action accrues and three years if the cause of action arises out of a willful violation."  *Trezvant v. Fidelity Emp'r Servs. Corp.*, 434 F. Supp. 2d 40, 51 (D. Mass. 2006) (citing 29 U.S.C. § 255);

---

[24] Plaintiffs themselves appear to have conceded that "[t]he City actually paid [p]laintiffs as specified by the CBA from at least May 2014 to present."  (*See* Pl. SMF & Def. Resp. at ¶ 6).

*see also McLaughlin v. Boston Harbor Cruises, Inc.*, 2006 WL 1998629, at *1 (D. Mass. July 17, 2006) (noting that § 255 "bars an action arising out of a claimed [ ] violation of the statute unless it is 'commenced'" within the applicable statute of limitations).  For the three-year limitations period for "willful" violations to apply, a plaintiff must show that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

Here, the City has moved for summary judgment on the statute of limitations issue.  It contends that the limitations period governing plaintiffs' FLSA claims should be two years because it did not willfully violate the statute, and indeed acted in good faith to comply with it, with respect to its regular rate calculations.

Plaintiffs have not put forth evidence sufficient to establish that any FLSA violations by the City were willful.  They contend that the City exhibited a "reckless disregard for compliance with the FLSA" as evidenced by its "disregard for accumulating any information."  (Pls.' Opp. Mem. at 27).  But the First Circuit has rejected the notion that a failure to investigate compliance with the FLSA can, without more, constitute willfulness.  *See Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 681 (1st Cir. 1998) ("The [Supreme] Court [] expressly rejected a negligence standard of liability . . .").  "Although it is possible to envision circumstances in which a failure to make further inquiry into the legality of one's conduct might constitute a reckless disregard of the FLSA," *id.* at 680, plaintiffs have not put forth sufficient evidence here to make such a showing.

Both sides were represented by counsel during the negotiation of the CBA.  The City's Chief Labor Counsel testified in his deposition that he believed the CBA complied with the law.  At the time the CBA was negotiated, neither the City's nor the SPEA's counsel suggested

otherwise.  (Collins Decl. ¶¶ 3-4).  And the fact that the City paid plaintiffs in accordance with the CBA, which it believed complied with the law, is strong evidence that any FLSA violations were not willful.  *See Howard v. City of Springfield*, 274 F.3d 1141, 1144 (7th Cir. 2001) (affirming district court's finding of no willfulness where the defendant city paid its officers in accordance with a negotiated CBA); *Rudy v. City of Lowell*, 777 F. Supp. 2d 255, 263 (D. Mass. 2011) (finding no willfulness where the defendant city paid plaintiffs in accordance with a negotiated CBA); *Caraballo v. City of Chicago*, 969 F. Supp. 2d 1008, 1025 (N.D. Ill. 2013) (same).

In summary, because the City complied with a negotiated CBA that no one suggested was unlawful, and plaintiffs have failed to offer any evidence that the City was aware of, or recklessly disregarded any FLSA violations, no reasonable jury could conclude that any violations were willful.  Accordingly, the City's motion for summary judgment as to the statute of limitations issue will be granted, and a two-year limitations period will apply to all claims.

### 2.     Liquidated Damages and Good Faith

The City next contends that plaintiffs are not entitled to liquidated damages because it acted in good faith with respect to its regular rate calculations.

Under the FLSA, an employee may recover "their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C § 216(b).  A court may decline to award liquidated damages if an employer shows that any conduct resulting in an FLSA violation was in "good faith" and that it had "reasonable grounds for believing" that it complied with the statute.  29 U.S.C. § 260.

Courts have repeatedly held that a municipality acts in good faith within the meaning of § 260 if it retains experienced counsel, negotiates a CBA that is approved by those experienced

37

counsel, and complies with that CBA.  *See Brooks v. Village of Ridgefield Park*, 185 F.3d 130,

137-138 (3d Cir. 1999); *Featsent v. City of Youngstown*, 70 F.3d 900, 906-07 (6th Cir. 1995);

*Rudy*, 777 F. Supp. 2d at 263.  That is true whether any ensuing FLSA violations turn on open

questions of law, *see, e.g.*, *Rudy*, 777 F. Supp. 2d at 262-263 (defendant applied § 207(h)(2)

offsets cumulatively), or are apparent from established law, *see, e.g.*, *Featsent*, 70 F.3d at 906-

907 (defendant failed to include wage augments).

Again, both the City and plaintiffs' union were represented by experienced counsel, none

of whom questioned whether the CBA complied with the FLSA.  Furthermore, the City complied

with the terms of that CBA.  Thus, "[f]rom its attorney's silence, the City was entitled to the

reasonable belief that the [CBA] did not violate the . . . FLSA."  *See Featsent*, 70 F.3d at 907.

Accordingly, liquidated damages are not warranted and the City's motion for summary judgment

as to that issue will be granted.

### 3. Offsetting FLSA Liability with Premium Payments

The City next contends that it is entitled to offset any FLSA liability with all "premium"

payments already paid to plaintiffs—that is, "extra compensation" creditable toward overtime.  It

specifically contends that it is entitled to set off any gratuitous payments that have already been

paid to each plaintiff on an inter-week, or cumulative, basis against any FLSA liability it may

have.

Section 207(h)(2) of the FLSA allows for "[c]redit toward minimum wage or overtime

compensation of amounts excluded from regular rate" as follows:

> (2) Extra compensation paid as described in paragraphs (5), (6), and (7) of
> subsection (e) [concerning certain "extra compensation provided by a premium
> rate . . ."] shall be creditable toward overtime compensation payable pursuant to
> this section.

29 U.S.C. § 207(h).

The parties dispute whether any such credits may be applied cumulatively or only on a week-by-week basis.  "The FLSA does not provide an explicit answer to this difference of interpretation and the United States Circuit Courts have taken divergent positions.  Some courts have held that § 207(h) offsets should be calculated on a workweek basis."  *Rudy*, 777 F. Supp. 2d at 259 (collecting cases).  "The First Circuit has not directly addressed this issue, and judges in this District have reached different conclusions."  *Urbani v. Wellesley Coll.*, 2016 WL 6571247, at *13 (D. Mass. Jan. 12, 2016).  *Compare Murphy*, 516 F. Supp. 2d at 160-61 (Stearns, J.) (allowing cumulative offsets); *O'Brien*, 491 F. Supp. 2d at 176 (D. Mass. 2007) (Ponsor, J.) (same), *with Urbani*, 2016 WL 6571247, at *13 (Burroughs, J.) (holding that Section 207(h) offsets are only available on a workweek basis); *Rudy*, 777 F. Supp. 2d at 259 (D. Mass. 2011) (Gorton, J.) (same).

While there is certainly ample room for doubt, the Court finds that § 207(h) offsets may only be applied on a week-by-week basis.  That conclusion appears to be consistent with the FLSA, pronouncements by the Department of Labor, and established First Circuit law.  *See generally Urbani*, 2016 WL 6571247, at *13-15.

First, the FLSA calculates overtime liability on a week-by-week basis.  An individual workweek is the FLSA's "basic unit of measurement."  *Rudy*, 777 F. Supp. 2d at 260; *see* 29 U.S.C. § 207(a)(1).  "If overtime liability is calculated on a workweek basis, employers should not be allowed to offset their weekly overtime liability with premium payments made outside of that workweek."  *Urbani*, 2016 WL 6571247, at *13.  Allowing them to do so would be inconsistent with the FLSA's basic framework.  Furthermore, it would "frustrate the FLSA's requirement that overtime payments be made in a timely manner."  *Id.* at *14 (citing *Rudy*, 777 F. Supp. 2d at 261; *Howard*, 274 F.3d at 114).  With cumulative offsets, employers would have

an incentive to "withhold overtime earnings in order to offset them against potential 'short' weeks in the future." *Rudy*, 777 F. Supp. 2d at 261.

Second, the Department of Labor has taken the view that offsets should apply week-by-week, both in an interpretive regulation and an opinion letter. The relevant regulation, 29 C.F.R. § 778.202(c), provides that contractual overtime premiums may be offset "against the overtime compensation which is due under the statute for hours in excess of 40 *in that workweek*." (emphasis added). The First Circuit cited § 778.202(c) with approval in *O'Brien*, observing—albeit in *dicta*—that contractual overtime premiums "may be offset against any statutory overtime liability *in the same week*." *O'Brien*, 350 F.3d at 289 (emphasis added). And in a 1985 opinion letter, the DOL expressly stated that "surplus overtime premium payments, which may be credited against overtime pay pursuant to section 7(h) of FLSA, *may not* be carried forward or applied retroactively to satisfy an employer's overtime pay obligation in future or past pay periods." *Opinion Letter from Herbert J. Cohen, Deputy Administrator, U.S. Dep't of Labor*, WH–526, 1985 WL 304329, at *4 (Dec. 23, 1985) (emphasis original).[25]

The City relies substantially on *Lupien v. City of Marlborough*, 387 F.3d 83 (1st Cir. 2004), in support of its view that offsets may be applied cumulatively. There, police officers alleged that Marlborough's policy of allowing officers to accept compensatory time instead of overtime payments violated the FLSA. After Marlborough conceded liability, the district court addressed damages. The police officers had already redeemed much of their compensatory time, but they argued that those redemptions could only be offset against FLSA overtime liability

---

[25] DOL opinion letters "do not warrant *Chevron*-style deference" and "are 'entitled to respect' . . . only to the extent that th[eir] interpretations have the 'power to persuade.'" *Calvao*, 599 F.3d at 18 (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

incurred in that same workweek. *Id.* at 86. The district court rejected that theory, permitting Marlborough to offset the value of redeemed compensatory time against its FLSA overtime liability, regardless of when redemption occurred. *Id.* at 84-85. The First Circuit affirmed, holding that permitting Marlborough to offset redeemed compensatory time only on a week-by-week basis would be "contrary to the FLSA's aim that 'plaintiffs are entitled to be made whole, not to a windfall at the [City's] expense.'" *Id.* at 90 (quoting *Roman*, 147 F.3d at 77).

     *Lupien*, however, is distinguishable. As the court explained in *Urbani*, "[t]he key difference is that the 'comp[ensatory] time' in *Lupien* had been offered to plaintiffs *as a substitute for* statutory overtime payments." *Urbani*, 2016 WL 6571247, at *15 (emphasis original). In *Lupien*, the First Circuit permitted cumulative offsets so that the plaintiffs would not recover the overtime owed to them under the FLSA twice, once in the form of redeemed compensatory time and once as monetary damages, resulting in a "windfall at the City's expense." *Lupien*, 387 F.3d at 90. "The same cannot be said, however, of the 'extra' compensation payments that are eligible to be offset against FLSA overtime liability pursuant to Section 207(h)(2)." *Urbani*, 2016 WL 6571247, at *15.

     Here, as in *Urbani*, plaintiffs "are entitled to such payments under the terms of their collective bargaining agreement[], irrespective of any statutory overtime they may receive." *Id.* Under the circumstances, "there is no risk [with week-by-week offsets] that [p]laintiffs will be 'paid twice' for statutory overtime . . . or that this would otherwise produce a 'windfall' for employees." *Id.* They will receive, at most, only what they are due under the FLSA *and* the CBA. That can hardly be called a windfall, as it "most closely reproduces what [plaintiffs] would be entitled to had there been no error in the City's initial computation of its overtime liability." *Rudy*, 777 F. Supp. 2d at 261.

Accordingly, the City may apply any § 207(h) offsets as a credit against damages on a

week-by-week basis only, and not cumulatively.  Accordingly, plaintiffs' motion for summary

judgment will be granted to the extent that it seeks to limit the City's ability to apply § 207(h)

offsets cumulatively, and the City's cross-motion on the same issue will be denied.

### 4.    <u>Treble Damages for Late Payments</u>

The City next contends that for any Wage Act claims based on late payments, plaintiffs

cannot recover treble damages, only interest based on the delay in payment.  It specifically

contends that if it has liability for any delayed payments to plaintiffs for work performed on city

and/or private details, the proper measure of damages is limited to the interest accrued between

the time that payment became due and the time of payment.

The purpose of the Wage Act is "to protect wage earners from the long-term detention of

wages by unscrupulous employers." *Melia*, 462 Mass. at 170.  An employer violates the Wage

Act by failing to pay "each . . . employee the wages earned by him to within" six or seven days,

depending on the employee's pay schedule.  *See* Mass. Gen. Laws Ann. ch. 149, § 148.  An

employee who succeeds on a claim under the Wage Act "shall be awarded treble damages, as

liquidated damages, for any lost wages and other benefits . . . ."  Mass. Gen. Laws ch. 149, §

150.

At one time, a plaintiff's recovery of treble damages under the Wage Act was a decision

left to judges' discretion.  *See Wiedmann v. The Bradford Grp, Inc.*, 444 Mass. 698, 710 (2005).

However, "in 2008, the Legislature made trebling of 'lost wages and other benefits' mandatory."

*Clermont v. Monster Worldwide, Inc.*, 102 F. Supp. 3d 353, 358 (D. Mass. 2015).  Nonetheless,

courts have since held that wages paid late, but in full, "are not 'lost wages' within the meaning

of [ch. 149, § 150]."  *Id.*; *see also Crowe v. Harvey Klinger, Inc.* 2018 WL 6819329, at *11-12

(D. Mass. 2018); *Awuah v. Coverall North Am., Inc.*, 740 F. Supp. 240, 244-45 (D. Mass. 2010). They have held so in cases where the late wages in question were paid before a complaint was filed, *see Clermont*, 102 F. Supp. 3d at 358, as well as in cases where the late wages were paid after filing, *see Crowe*, 2018 WL 68193219, at *6, 11-12.  In both scenarios, the courts limited damages to the award of interest. *Crowe*, 2018 WL 6819329, at *11-12; *Clermont*, 102 F. Supp. 3d at 358; *Awuah*, 740 F. Supp. at 245.

Plaintiffs contend that *George v. National Water Main Cleaning Co.*, 477 Mass. 371 (2017), requires a different result.  Specifically, plaintiffs point to the following passage:

> In the context of a violation of the Wage Act, "liquidated damages" properly would include the various additional costs that might be incurred by an employee who has not been timely paid his or her full wages, but who still needs to pay for the family's housing, transportation, food and clothing, tuition, and medical expenses. The damages arising from delay in paying the wages due might be considerable, depending on the employee's circumstances, but they would be difficult to quantify with precision.

*Id.* at 380.

According to plaintiffs' interpretation, that passage means that, under the Wage Act, liquidated damages must be available for delayed payments as an imperfect estimate of the various costs that any delay may impose.  The problem with that interpretation is that liquidated damages are only available for lost wages, not merely delayed ones.  Indeed, in *George*, the SJC was considering a claim for the "nonpayment" of damages.  *Id.* at 371.  Accordingly, its explanation of the import of "liquidated damages" should be read in context, and thus, to only apply to claims for lost wages, not claims of delayed payment.

In short, plaintiffs here are not entitled to treble damages, which are awarded "for any lost wages and benefits."  Rather, the plaintiff is entitled only to "damages incurred"—that is, any foregone interest.  *See* Mass. Gen. Laws ch. 149 § 150 (listing "damages incurred" separately from "lost wages and other benefits"); *Clermont*, 102 F. Supp. 3d at 358.  Because the

City ultimately paid plaintiffs, although late, they have not suffered any "lost wages" and cannot recover treble damages under the Wage Act.

For those reasons, the City's motion for summary judgment will be granted to the extent that it seeks to limit any Wage Act claims for delayed payments to the interest accrued between the time any such payment became due and the time it was ultimately paid.

### 5.   Immunity from Prejudgment Interest

The City further contends that it is immune from prejudgment interest on plaintiffs' state-law claims under Mass. Gen. Laws ch. 231.  Plaintiffs have cross-moved for summary judgment on the same issue, contending that the Wage Act itself provides a statutory basis for imposing prejudgment interest that overcomes the sovereign immunity defenses raised by the City.  *See* Mass. Gen. Laws ch. 149, § 148 (". . . every county and *city shall so pay* every employee engaged in its business or wages or salary earned by him . . .") (emphasis added).  They further contend that Mass. Gen. Laws ch. 231, § 6C and § 6H also provide independent bases to impose prejudgment interest.

As an initial matter, the Wage Act does not provide an independent statutory basis for imposing prejudgment interest.  "[T]he payment of prejudgment interest in a Massachusetts court is governed by statute, either [Mass. Gen. Laws ch.] 231, § 6B, 6C, or 6H."  *George*, 477 Mass. at 378.  That general rule applies to Wage Act claims.  *Id.*

"Municipal liability implicates the doctrine of sovereign immunity, which protects the public treasury from unanticipated money judgments."  *Todino v. Town of Wellfleet*, 448 Mass. 234, 238 (2007).  "The rules of construction governing statutory waivers of sovereign immunity are stringent."  *Id.* (internal quotations omitted).  "Absent statutory language that indicates by express terms a waiver of sovereign immunity," such a waiver "may be found only . . . 'by

necessary implication' from the statute's terms." *DeRoche v. Massachusetts Comm'n Against Discrimination*, 447 Mass. 1, 12-13 (2006).  Here, the Wage Act has expressly waived sovereign immunity as to timely-pay claims, *see* Mass. Gen. Laws ch. 149, § 148, but neither that statute nor ch. 231, §§ 6B, 6C, or 6H explicitly waive immunity for prejudgment interest on such claims.[26]

Nonetheless, a waiver of the City's immunity as to prejudgment interest is clear by "necessary implication" from the Wage Act.  The Supreme Judicial Court has found implied waivers of sovereign immunity for liability for accrued interest under similar circumstances.  In *DeRoche v. Massachusetts Commission Against Discrimination*, 447 Mass. 1 (2006), the SJC held that the legislature had waived sovereign immunity with respect to the imposition of interest for claims under the Massachusetts anti-discrimination statute.  While that statute expressly permitted such claims against the Commonwealth, it "did not specifically authorize interest on" such claims.  *Id.* at 13.  The SJC, however, found such an authorization by necessary implication because it had previously held that awards of interest furthered the statute's remedial and compensatory purposes, and the Commonwealth was otherwise subject to the law.  *Id.*  Similarly, in *Todino*, the trial court had found Wellfleet liable under Mass Gen. Laws ch. 41, § 111F for back pay that it had not timely paid to an incapacitated police officer.  448 Mass. at 234-35.  On appeal, the SJC considered whether the officer was entitled to recover interest on that back pay. *Id.*  Section 111F was "silent . . . on the question whether a governmental employer must pay interest on amounts due the employee where payment has been delayed."  *Id.* at 238.  The SJC held that "the recovery of interest is necessarily implied by the potent language of § 111F that

---

[26] The parties dispute whether Mass. Gen. Laws ch. 231, § 6C, which applies only to contract actions, requires the award of prejudgment interest in claims under the Wage Act.  Because the Court finds that prejudgment interest is available to plaintiffs under § 6H, it does not reach the question of whether Wage Act claims also sound in contract for the purposes of § 6C.

requires timely payments" because the "only way" that an award for delayed compensation could "retain its stated worth is by adding interest in order to compensate for delay in payment from that point forward." *Id.* at 239. *See also Brookfield v. Labor Relations Comm'n*, 443 Mass. 315, 326 (2005) ("An award of interest on monetary relief is a necessary remedial component of [Mass. Gen. Laws ch. 150E, § 10(a)].")

Based on those decisions, it is likely that the Supreme Judicial Court would decide similarly here. As with the statute at issue in *Todino*, § 148 of the Wage Act is aimed at ensuring not only that plaintiffs receive what they are due, but in a timely manner. *See Melia*, 462 Mass. at 170. Because the only way to ensure that a plaintiffs' recovery of delayed wages "retain[s] its stated worth is by adding interest," the recovery of interest is necessarily implied by the statute. *See Todino*, 448 Mass. at 239. Similarly, awarding interest serves the statutory aim of compensating employees for their lost or delayed wages. *See DeRoche*, 447 Mass. at 13-14; *see also Brookfield*, 443 Mass. at 325-26.

Accordingly, Mass. Gen. Laws ch. 231, § 6H applies to this action, and prejudgment interest in the amount of 12% per annum will be added to any damages awarded to plaintiffs under § 148 of the Wage Act.

For those reasons, the City's motion for summary judgment on this issue will be denied, and plaintiff's cross-motion will be granted.

### 6.     Damages as to Plaintiffs McNally and Goulart

Plaintiffs contend that plaintiff James McNally is entitled to partial summary judgment for one week of FLSA damages of $357.83 for the workweek of October 22-28, 2017. They also contend that plaintiff Kevin Goulart is entitled to partial summary judgment for one week of FLSA damages of $304.17 for the workweek of June 18-24, 2017.

While a court may award damages at the summary judgment stage, they do so only if the damages are "readily calculable based on the undisputed facts." *See Martins v. 3PD Inc.*, 2014 WL 1271761, at *4 (D. Mass. Mar. 27, 2014) (citing *AEP Energy Servs. Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699 (2d Cir. 2010)); *see, e.g.*, *Ellicott v. American Capital Energy, Inc.*, 2016 WL 7799635, at *5 (D. Mass. Apr. 28, 2016) (denying summary judgment where plaintiffs' damages calculations were based on "disputed factual issues").

Here, disputed issues of fact preclude summary judgment on the damages claims of McNally and Goulart.  First, plaintiffs' model assumes that FLSA regular rates must be calculated using a denominator of 1,946.56 hours, but a case-by-case analysis is necessary to calculate that denominator, as detailed above.  Second, the calculations assume that all details worked for the city must be included in plaintiffs' FLSA regular rates, but again a case-by-case analysis is necessary to determine where such detail hours are excluded under 29 U.S.C. § 207(e)(7).  Finally, there are mathematical errors in plaintiffs' calculations.[27]

Accordingly, because the damages calculations for McNally and Goulart are based on disputed issues of fact, plaintiffs' motion for summary judgment as to that issue will be denied.

## 7.     Damages as to 191 City Details in Paragraph 45

Finally, plaintiffs contend that partial summary judgment should be granted for the 191 city details listed in paragraph 45 of their statement of material facts, resulting in base damages of $68,792 and treble damages of $203,376.  According to plaintiffs, those details are susceptible to summary judgment because they may be identified, without more, by either (1) a description of the detail on the weekly "export" report associating a detail with the "City of Somerville" or a city department, or (2) a description on the weekly "export" report associating the detail with a

---

[27] *See, e.g.*, Pls.' Mem. at 37-40 (incorrectly calculating $1052.38 * 2/3 = $700.92; $34.04 * 40 = $791.53).

third party, such as P.T. Kelley, and the omission of that party from that week's "910 form" log of third-party payments.

Again, summary judgment on damages is appropriate only if the damages are "readily calculable based on the undisputed facts." *See Martins*, 2014 WL 1271761, at *4. Here, however, plaintiffs' damages methodology is not undisputed. There are issues of fact as to whether, under the CBA, the City had up to 21 days to pay for details performed for the City or its entities, as discussed above. And plaintiffs' model assumes they are entitled to recover the full amount of their delayed pay for details plus treble damages, rather than interest only, as discussed above.

Accordingly, because there are disputed issues of fact and plaintiffs' model does not reflect the City's actual potential liability, summary judgment is inappropriate.[28] Plaintiffs' motion for summary judgment on this issue will therefore be denied.

## IV.   Conclusion

For the foregoing reasons, the motion of defendant City of Somerville for summary judgment and the motion of plaintiffs for partial summary judgment are GRANTED in part and DENIED in part, as set forth in this Memorandum and Order.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated: September 30, 2019

---

[28] The parties also dispute whether plaintiffs' model is reliable because it depends on manual records kept by the City's detail office. To the extent that plaintiffs' model for calculating Wage Act damages relies on disputed facts, summary judgment is also inappropriate for that reason.